IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CARLOS NAVARRO, | ) | 8:07CV381 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| TYSON FRESH MEATS, Inc., a | ) | |
| subsidiary of, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant's Motion for Summary Judgment. (Filing No. 43.)  As set forth below, the unopposed Motion is granted.

## I.   BACKGROUND

Plaintiff Carlos Navarro ("Navarro") filed his Complaint in this matter on September 25, 2007.  (Filing No. 1.)  Liberally construed, Plaintiff's Complaint alleges that Defendant discriminated against him based on his national origin and his sex in violation of Title VII of the Civil Rights Act of 1964.  Navarro also alleges a claim for national origin discrimination pursuant to 42 U.S.C. § 1981 and various state-law claims.

Defendant filed its Motion for Summary Judgment on July 16, 2008.  (Filing No. 43.)  Along with its Motion, Defendant also filed an Index of Evidence and Brief in Support.  (Filing Nos. 44 and 45.)  Despite having more than six months in which to do so, Plaintiff did not file an opposition or any other response to Defendant's Motion.  (*See* Docket Sheet.)

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts as to which the moving party contends there is no

genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." *Id.*

Defendant submitted a statement of material facts in accordance with the court's Local Rules. However, Plaintiff has not submitted any "concise response" to those facts. Further, Defendant submitted evidence which was properly authenticated by affidavit. Plaintiff has not. This matter is deemed fully submitted and the material facts set forth by Defendant in its Brief are "deemed admitted" and are adopted below.

## II.   RELEVANT UNDISPUTED FACTS

The Parties

1.     Tyson Fresh Meats, Inc. ("Tyson") operates a pork processing plant in Madison, Nebraska (the "Madison plant"). Tyson has owned the Madison plant since October 2001, when it purchased IBP, Inc.

2.     At the Madison plant, Tyson slaughters hogs and processes them into the cuts of pork that consumers see on grocery store shelves. Tyson has more than 1000 employees (or "team members") at the Madison plant.

3.     Plaintiff was born in El Salvador. He lived in El Salvador for the first 20 years of his life. He then moved to the United States, where he has since lived. Plaintiff is a Spanish speaker; he understands very little English.

2

4.     Plaintiff began working at the Madison plant in April 2001.  He was hired by IBP and became a Tyson team member after IBP sold the Madison plant to Tyson.

The Process by Which Team Members are Assigned to Jobs at the Madison Plant

5.     The manner in which Tyson's hourly team members are assigned to positions depends on whether or not the team member has work restrictions and, if so, whether the work restrictions are due to a work-related injury.

6.     Team members without work restrictions may change positions through a bid process.  In general, when a regular duty position on the kill floor becomes available, the opening is posted internally and eligible team members are given an opportunity to bid for the job.  The job is awarded to the qualified team member with the most seniority.  Seniority is assessed on the basis of tenure within the department containing the opening.  If no qualified team member from that department bids, seniority is determined by plant tenure.

7.     Some openings may also be filled by newly-hired team members.  After initial training and orientation, newly-hired team members are assigned to open positions.  After 90 days on the job, new team members may bid for any open position as described in the previous paragraph.  A team member without work restrictions may be moved involuntarily from his or her regular position to another position, depending on the business needs of the plant.

8.     If a team member has work restrictions due to a work-related injury, job assignments must be approved by one of Tyson's nurses.  Initially, the nurse determines whether the duties of the team member's regular position can be performed by a person with the work restrictions at issue.  If so, the team member continues to work in his or her regular position.  If not, the team member is reassigned to a position that can be performed by a person with the work restrictions

3

at issue. Depending on the circumstances, the alternate position may be a different regular duty position or a restricted duty position.

9.     Often, if a team member with work restrictions needs to be moved to another position, a number of different positions would be compatible with the work restrictions. If that is the case, the team member is placed by his/her supervisor in a position which meets the current business needs of the plant and which the nurse has approved for the restrictions at issue. If the needs of the company change, a team member with work restrictions from a work-related injury may be moved involuntarily to another position, again provided the nurse determines that the duties of the new position can be performed by a person with the restrictions at issue.

10.     In determining whether a position can be performed by a person with a given set of work restrictions, the nurse compares the work restrictions at issue with the duties of the position. Work restrictions may be imposed by a health care provider or by a Tyson nurse, if the team member has not yet seen a health care provider. The work restrictions are recorded in a team member's Medical Card Report.

11.     The duties of a position are included in its job description. One of the responsibilities of Tyson's Industrial Engineer is to create job descriptions for each position in the Madison plant. In the course of creating job descriptions, the Industrial Engineer itemizes and measures the duties of the position, including the requirements, speed, and training time.

12.     The Industrial Engineer also identifies and measures each stressor associated with the job, including bending, lifting, temperature of the environment, and so forth. This information is included in the job description. Once drafted, the job description for a restricted duty job is sent to corporate headquarters for approval or modification if necessary. Two members of the Industrial Engineering group must sign off on the final version of the job description before it becomes an available job.

13.     If a person with the work restrictions in question can do all of the duties of a position within their restrictions, the nurse may approve the team member's assignment to that job.  Sometimes, a team member with a given set of work restrictions is able to perform nearly all, but not every one of the duties on the job description.  In that case, the nurse determines whether the duties of the job can be narrowed or modified to remove those that are incompatible with the work restrictions.  If so, the nurse may approve the team member's assignment to that modified job.  If the job cannot be modified, the employee may not be assigned to that position.

14.     When the nurse approves a job assignment for a team member, the nurse completes a Job Activity Slip that identifies the position.  A copy of the slip is provided to the team member's supervisor to inform the supervisor that the team member has been approved to work the position identified.

15.     Although team members may be reassigned to various positions under the process described above, except for a move pursuant to a successful bid for a new position, the reassignment does not change any formal title that a team member may have.  Such reassignment also does not diminish the team member's wage or benefits.

16.     Team members share responsibility for ensuring that the work they do complies with their work restrictions.  A team member with work restrictions due to a work-related injury has the ability at his or her sole, unfettered discretion to decline a job assignment or to stop working in an assigned position before the shift concludes.  To exercise that right, a team member signs a Declination of Restricted Duty form.  If the team member declines work and goes home, the team member is not paid for the time off.  A team member may use the time off however he or she wishes, including to see a doctor to determine whether the doctor will order different work restrictions.

Plaintiff's Job Assignments

5

17.     Plaintiff had work restrictions throughout much of his tenure with Tyson. Over the years, Plaintiff was assigned to more than 15 different positions (many more than once). Each time, the assignment was made according to the procedures and policies described above.

18.     Plaintiff challenges four separate job assignments as discriminatory and in violation of his work restrictions.

19.     The first job assignment Plaintiff challenges was assigned in April and May 2003. At that time, Plaintiff was assigned a job in the "Knife Room" and, two weeks later, the job "Trim or Cut Tenders." Soon after, on May 16, 2003, Plaintiff was assigned the job "Fecal Monitor," at which he remained off and on until early December of 2003.

20.     Plaintiff does not know who assigned him to the first position that he claims he was assigned to in violation of his work restrictions. He does not know what his work restrictions were and he does not know how the job assignment allegedly violated his work restrictions.

21.     The second job assignment that Plaintiff asserts violated his work restrictions was his assignment on May 2, 2005, the last day he actually worked at Tyson. That position is the "Check Heads" position.

22.     In the Check Heads job, the team member examines the hog's head for contamination. The job may be performed while sitting, except when the team member is rinsing off contamination.

23.     When the carcass passes by the team member, it is attached to the moving chain by its rear feet with its head hanging down closest to the floor. The head hangs down at the level of the team member's thigh. The head is connected to the carcass by only a thin flap of skin in the back.

6

24.     At this stage of the disassembly, the exterior skin and interior of the head have been already been removed.  The head weighs on average less than 13 pounds.  The thin attachment of the head to the carcass allows the team member to tilt and rotate the head easily when checking for contamination.  If a team member raised the head all the way up from its standard thigh level height, at its highest point the head would be at chest or shoulder level.  The partial attachment of the head to the carcass prevents the head from being tilted or raised any higher than shoulder level.

25.     Plaintiff contends that the job assignment to Check Heads violated his work restrictions because he had to lift the head of the hog high.

26.     On May 2, 2005, Plaintiff had the following work restrictions: occasional lift up to 35 pounds; frequent lift up to 20 pounds; occasional bend, twist, squat, kneel, climb; no crawling; frequent grip, pinch; occasional push/pulling, reach above shoulder; restricted standing/walking to 4 hours per day; and restrict sitting to 2-4 hours per day.  A team member with Plaintiff's work restrictions could perform the duties of the Check Heads position.

27.     Plaintiff does not know the name of the third position that he claims he was assigned to in violation of his work restrictions.  However, based on Plaintiff's description of the position as pushing aside bad pork carcasses from an ongoing conveyor where the carcasses were hanging, the name of the position is "Space Hogs."

28.     Plaintiff does not know when he was assigned to the Space Hogs position.  Tyson's records show that Plaintiff was assigned to the Space Hogs position on February 12, 2002.  He worked in this position off and on until mid-April 2002.  Plaintiff was not assigned to the Space Hogs position after April 15, 2002.

29.     The fourth job assignment that Plaintiff claims violated his work restrictions was his assignment to a position called the "Snout Wheel."

7

30.     Plaintiff does not know when he was assigned to the Snout Wheel position.  Tyson's records show that Plaintiff was assigned to the Snout Wheel position on February 28, 2002.  He was assigned to the position for a few hours each day as part of a work hardening program in which he alternated between the Snout Wheel and the Space Hogs positions.  Plaintiff did not work in the Snout Wheel position after March of 2002.

Similarly Situated Allegations

31.     Plaintiff asserts that Dorothy Gomez was a similarly situated employee who was treated differently than he was with respect to job assignments.  Plaintiff does not know, however, what Gomez's work restrictions were.  Nor does Plaintiff know what Gomez's job assignments were.

32.     Plaintiff asserts that Anita Williams was a similarly situated employee who was treated differently than he was with respect to job assignments.  Plaintiff does not know what Williams's work restrictions were.  According to Plaintiff, Tyson assigned Williams to check sterilizers and make sure the water was not too hot.  Plaintiff does not know any other job to which Williams was assigned and does not know the nature of Williams's injury.

33.     Plaintiff asserts that Earl Allen was a similarly situated employee who was treated differently than he was with respect to job assignments.  Plaintiff does not know what Allen's work restrictions were.  Nor does Plaintiff know what Allen's job assignments were.

34.     Plaintiff asserts that Douglas McKenna was a similarly situated employee who was treated differently than Plaintiff with respect to the Snout Wheel job assignment.  Plaintiff changed this assertion at his deposition, stating that the different treatment occurred when he and McKenna were working together in the last part of 2003 checking the backs of carcasses for contamination.  Plaintiff asserts that

8

McKenna was permitted to use a chair and he was not. Plaintiff's work restrictions in place during the latter half of 2003 did not require that Plaintiff be permitted to sit for any length of time.

35.     Further, Tyson has never had a team member named Douglas McKenna at the Madison plant. The company records contain no team member with that name by any spelling.

Alleged Intimidation and Ridicule

36.     In addition to challenging four job assignments, Plaintiff asserts that he was intimidated and ridiculed. When asked to specify each alleged incident of intimidation and/or ridicule, Plaintiff listed five: (1) Supervisors Paul, Chad, Lloyd, and Bill would shadow Plaintiff without any apparent reason; (2) On more than one occasion, supervisor Lloyd threw dirty pieces of meat at the Plaintiff's legs and told him that he had missed that piece; (3) Plaintiff was constantly yelled at to watch his job; (4) Supervisors would make faces at Plaintiff; and (5) In response to Plaintiff's allegation of harassment, supervisor Paul said, "Yes, you're Mexican and I'm your boss."

37.     Plaintiff elaborated on these allegations at his deposition. He asserts that the named supervisors followed him to the bathroom, followed him to the infirmary and watched him when he was doing his job. When Plaintiff worked in each supervisor's area, the supervisor would watch him. Plaintiff concedes that the supervisors also watched all the other team members in their areas, but asserts that "it's as if" the supervisors were more attentive to him to make him fed up.

38.     Plaintiff never complained to anyone at Tyson about being followed or shadowed.

39.     The only examples that Plaintiff could provide of alleged efforts to make

him fed up were supervisors telling him that he was not doing a job well and supervisor Lloyd throwing dirty pieces of meat at Plaintiff's feet. More specifically, Lloyd would bring pieces of meat to Plaintiff and say that Plaintiff was not doing his job correctly because he had let dirty pieces of meat go by his station. Lloyd would then throw the meat down, sometimes hitting Plaintiff on his foot.

40.     Plaintiff worked for Tyson's supervisor Lloyd Meis when Plaintiff was assigned to the Fecal Monitor position. Plaintiff worked in that position off and on between May 16, 2003, and early December of 2003. Meis did coach Plaintiff when Plaintiff allowed contaminated meat to pass his station. Meis also would cut off the contaminated meat and drop it onto the inedible conveyor belt, which ran at the feet of the team members. That is where contaminated meat is supposed to be placed so that it can be disposed of properly.

41.     According to Plaintiff, supervisor Chad would also tell Plaintiff when he was not doing his job well or show him pieces of meat that he should not have let go by. At no time during Plaintiff's employment did Tyson employ a supervisor named Chad at the Madison plant.

42.     As to faces, Plaintiff states that Bill Fenton and the head of safety, a man named Steve, would stand at the entrance of the plant when the team workers arrived. Sometimes other team members walked in with Plaintiff. Fenton and Steve did not say anything to Plaintiff, but they would move their head or they would move as if to hit the wall. Also, Plaintiff asserts that Paul Widhalm would purse his lips and move his head from side to side.

43.     Plaintiff never complained to anyone at Tyson about faces or gestures being made toward him.

44.     According to Plaintiff, on March 9, 2005, he was in Paul Widhalm's office, meeting with Widhalm and an interpreter Carlos Lopez. At the time, Plaintiff

held a position in which he was responsible for monitoring the front part of the hog for contamination. Widhalm told Plaintiff that he was letting a lot of hogs go by with contamination on them and Widhalm was going to give Plaintiff a warning. In response, Plaintiff complained that he was being harassed, to which Widhalm purportedly replied, "Yes, you're Mexican and I'm your boss."

45.    Plaintiff did not complain to anyone at Tyson about Widhalm's alleged remark.

Plaintiff's Final Day Working at the Madison Plant

46.    On May 2, 2005, Plaintiff arrived at work and began performing the Mark V&H job. The Mark V&H job is a restricted duty position to which Plaintiff had been assigned since July of 2004.

47.    A need arose that day for a team member to be assigned to the Check Heads position. Although a restricted duty job, Check Heads is an essential and mandatory position on the line. The duties of the position are essential and, because of where the position is on the line, the duties cannot be performed by other team members. In this way, Check Heads differs from some other restricted duty positions. For example, the Mark V&H position is actually a component of the regular duty job Trim Viscera. If a restricted duty position is not needed for a recovering team member, the Mark V&H duties return to the team member performing Trim Viscera. Because Check Heads is different, Widhalm needed to fill the vacancy once he learned that the team member who had been performing the Check Heads job was not available.

48.    Widhalm met with a nurse to determine whether any team members with work restrictions could be assigned to the Check Heads job. The nurse compared Plaintiff's restrictions to the Check Heads description and determined that Plaintiff could perform the job. Because the Check Heads job had to be performed, and

11

because the Mark V&H job could be covered by others, Plaintiff was assigned by the nurse to the Check Heads job.

49.     Around 2:00 p.m., Plaintiff met with Widhalm and a nurse.  They explained to Plaintiff that he was being assigned to the Check Heads position, which Plaintiff had worked in the past and which was compatible with his work restrictions. Plaintiff did not say anything or give any indication of disagreement or concern.  The meeting adjourned and Plaintiff went to work the Check Heads position.

50.     Plaintiff only worked in the position for a very short time before he stopped, complained of pain and was sent to the nurse.  The nurse cleared him to return to work.  Nevertheless, Plaintiff refused to go back to the Check Heads job.

51.     When Plaintiff refused to return to work, he was taken to the office of the Plant Superintendent, Bill Fenton.  This meeting took place within 15 minutes of when Plaintiff was originally assigned to the Check Heads position.  Present at the meeting were Plaintiff, Fenton, Widhalm, nurse Jean Muehlmeier, and an interpreter. Fenton asked Plaintiff why he refused to do the Check Heads job and Plaintiff replied that it hurt his back. With Muehlmeier, Fenton reviewed the job duties and Plaintiff's restrictions and explained to Plaintiff that he had been cleared to work the Check Heads job and that it fit Plaintiff's work restrictions.  Plaintiff still refused to return to the job.

52.     Fenton offered to have another employee work with Plaintiff until his body adjusted to the new job.  Fenton also asked Plaintiff whether he wanted to sign a Declination of Restricted Duty form, as he had done in the past, and go home. Plaintiff asked whether he would be paid.  Fenton replied that the leave after signing a declination form was unpaid.

53.     Plaintiff refused to sign a declination form and refused to return to work. As a result, Fenton told Plaintiff he was suspended and instructed Plaintiff to clock

12

out, leave and return to the Madison plant at 8:00 a.m. the next day to discuss his work status. The meeting adjourned.

54.     Five minutes later, Plaintiff and the interpreter returned to Fenton's office because Plaintiff refused to clock out and leave. Plaintiff wanted Fenton to give him a paper stating that Tyson had terminated Plaintiff so that he could collect unemployment benefits. Fenton declined and told Plaintiff to leave and come back the next day at 8:00 a.m. When Plaintiff refused, Fenton warned Plaintiff that law enforcement would have to get involved if Plaintiff did not leave the Madison plant on his own. Plaintiff responded by saying that he did not care if Fenton called the police and refused to leave.

55.     Fenton went into his office and called the sheriff's office. Plaintiff did not hear the call. He was sitting in the waiting room in front of the infirmary.

Plaintiff's Arrest

56.     Approximately three to five minutes later, Investigators Michael Bowersox and Richard Drummond (the "Investigators") of the Madison County Sheriff's Office arrived at the Madison plaint.

57.     Upon arriving at the Madison Facility, Investigators Bowersox and Drummond spoke with Fenton, who told the Investigators that he had asked Plaintiff to leave the plant because he refused to work his assigned job. Plaintiff was not present during the conversation between Fenton and the Investigators and does not know what Fenton said.

58.     The Investigators, with the assistance of an interpreter, spoke to Plaintiff and informed him that he had the opportunity to leave the Madison plant voluntarily and if he refused the Investigators would have no choice but to arrest him. In fact, the Investigators offered Plaintiff several chances to leave voluntarily. Each time the

Investigators offered Plaintiff the choice of leaving the plant or going to jail, Plaintiff asked to be arrested. All that Plaintiff remembers of this conversation is that the Investigators told him he had a minute or two to leave the plant.

59.   When the Investigators realized that Plaintiff would not leave voluntarily, Investigator Bowersox placed Plaintiff under arrest and drove him to the Madison County jail. When Investigator Bowersox decided to arrest Plaintiff, he exercised his own independent judgment. No one at Tyson told the Investigators to arrest Plaintiff. The Investigators did not act as Tyson's agents.

60.   No one from Tyson gave the Investigators false information or information that the Investigators believed to be false. Plaintiff is not aware of any information that Fenton or Widhalm gave the State of Nebraska about him.

61.   Plaintiff cannot state any way in which he was assaulted or battered.

62.   The County Prosecutor filed trespassing charges against Plaintiff, but then dismissed the lawsuit. Tyson did not ask the County Prosecutor to bring charges against Plaintiff. Tyson was not involved in any aspect of the state's lawsuit, including the filing and dismissal of the lawsuit.

Plaintiff's Termination

63.   Navarro did not return to work the next day, May 3, 2005, as he had been instructed. He never returned to work after May 2, 2005. On May 6, 2005, Tyson sent a certified letter to Plaintiff asking why he had not returned to the plant at 8:00 a.m. on May 3rd as instructed. Tyson sent another certified letter on May 24th and a third on June 1st. The third stated that Plaintiff had been removed from payroll, effective June 1, 2005.

64.   Plaintiff filed his charge of discrimination on July 20, 2005, with the

Nebraska Employment Opportunity Commission.

(*See* Filing Nos. 44 and 45.)

## III.   ANALYSIS

### A.   Standard of Review

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate the allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.   Timeliness of Plaintiff's Claims

Defendant argues, among other things, that some of Plaintiff's claims are time-

barred.  The court agrees.  Where an individual has "initially instituted proceedings with a State or local agency," alleging that he has been subject to unlawful employment practices, he must file a charge with the Equal Opportunity Employment Commission ("EEOC") "within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  "The statute of limitations begins to run at the time of the discriminatory act."  *Connor v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th Cir. 1996).

Here, Plaintiff first initiated proceedings with the NEOC and his claims are therefore subject to the three-hundred day time limitation.  Plaintiff filed his charge with the NEOC on July 20, 2005.  (Filing No. 44-15, Attach. 14, at CM/ECF p. 1.)  Thus, any claims based on conduct occurring prior to September 23, 2004 are untimely.[1]  Three of Plaintiff's job assignments, which he claims are discriminatory, occurred prior to September 23, 2004.  Plaintiff's assignment to, and performance of, the Space Hogs, Snout Wheel, and Trim and Cut Tenders positions all occurred prior to September 23, 2004.  (Filing No. 44-3, Attach. 2, at CM/ECF pp. 3-4.)  Any claims relating to these positions, as well as any related "ridicule" or "harassment" claims, are therefore untimely.[2]

Thus, the only remaining claims are those relating to Plaintiff's assignment to the Check Heads position and any related "ridicule" or "harassment" incidents occurring after September 23, 2004.

### C.     Plaintiff's Remaining Claim

---

[1]Plaintiff does not allege a continuing violation.  (Filing No. 44-15, Attach. 14, at CM/ECF p. 1.)

[2]Even if Plaintiff's claims regarding these three job assignments were not time-barred, they were not exhausted before the NEOC.  (Filing No. 44-15, Attach. 14, at CM/ECF p. 1.)

Plaintiff claims that he was assigned to the Check Heads position, and ultimately terminated, because of his sex and his national origin in violation of Title VII of the Civil Rights Act of 1964. (Filing No. 1 at CM/ECF p. 1.) For the reasons stated below, Plaintiff's discrimination claim fails because Plaintiff has not set forth a prima facie case of discrimination.

Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To survive a motion for summary judgment, a plaintiff can demonstrate unlawful discrimination through either direct or indirect evidence. *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008). Claims premised on indirect evidence are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Because Plaintiff offers no evidence of direct discrimination, the court will analyze his claims under the *McDonnell Douglas* framework. Under this framework, Plaintiff bears the initial burden of proving a prima facie case of discrimination. *Id.* If Plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden shifts to the Defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *Bearden,* 529 F.3d at 831. If the Defendant articulates a nondiscriminatory reason, the burden returns to the Plaintiff to show that the proffered reason is pretextual. *Id.* at 831-32 (citing *Brannum v. Missouri Dep't of Corr.*, 518 F.3d 542, 548 (8th Cir. 2008)). However, the ultimate burden of persuasion remains with the plaintiff throughout the case.

### 1.    Prima Facie Case

17

Summary judgment may be entered in a Title VII action "if any essential element of the *prima facie* case is not supported by *specific facts* sufficient to raise a genuine issue for trial." *Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999) (emphasis added).   Accordingly, to set forth a prima facie case, Plaintiff must establish that: (1) he is a member of a protected group; (2) he was qualified for his position; (3) he was discharged; and (4) his discharge occurred in circumstances giving rise to an inference of discrimination. *Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005).   Construing the evidence submitted by Defendant in a light most favorable to Plaintiff, the court finds that Plaintiff has established the first three elements of his prima facie case.   Thus, if Plaintiff can show circumstances that give rise to an inference of discrimination, he has satisfied the first stage of the *McDonnell Douglas* analysis.   Plaintiff has not done so.

As set forth above, on his last day of work at Tyson, Plaintiff was assigned the Check Heads position.   Plaintiff was assigned this job through Tyson's usual procedure, which has no national origin or sex component.   The Check Heads position must be assigned, because it is a mandatory position in the production line. Plaintiff was assigned to the Check Heads position because, within his work restrictions, he could perform the job. (Filing No. 45 at CM/ECF pp. 10-11.) Despite this, Plaintiff refused to perform the Check Heads job and refused to leave the Madison plant unless he was paid.   He was eventually terminated by Tyson after he failed to return to work.   There is simply no evidence before the court that Plaintiff's national origin or sex figured into the decision to assign Plaintiff to the Check Heads position or to terminate his employment.   The evidence before the court instead shows that Plaintiff was terminated due his failure to perform his job and his failure to return to work.   (*Id.* at CM/ECF pp. 17-21.)

## 2.   Similarly-Situated Allegations

A review of all of the evidence properly before the court shows that Plaintiff's

allegations of national origin and sex discrimination may relate to other employees who were similarly situated but were treated differently with respect to job assignments.  However, "the test for whether employees are similarly situated to warrant a comparison to the plaintiff is rigorous." *Cronquist v. City of Minneapolis,* 237 F.3d 920, 928 (8th Cir. 2001).  Indeed, Plaintiff has the burden to show that the comparators are similarly situated in all relevant respects. *Riser v. Target Corp.,* 458 F.3d 817, 822 (8th Cir. 2006) (denying Title VII race discrimination claim where the plaintiff failed to show that comparators had similar jobs at similar locations and were cited for the same "shortcomings" as the plaintiff but were not disciplined).  Indeed, Plaintiff and his comparators must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. *EEOC v. Kohler Co.,* 335 F.3d 766, 776 (8th Cir. 2003).  Plaintiff has submitted no such evidence.  Rather, the undisputed facts before the court do not show that the comparators had similar work restrictions or similar job assignments.   To the extent Plaintiff's claims of discrimination are based on "similarly situated" individuals, his claims fail.  Because Plaintiff has submitted no evidence that his termination raised an "inference of discrimination," he has not set forth a prima facie case and summary judgment in favor of Defendant is warranted.[3]

### D.     Hostile Work Environment Claims

Plaintiff's Complaint also contains allegations of "intimidation and ridicule." (Filing No. 1 at CM/ECF p. 3.)  Defendant  liberally construes these allegations as a hostile work environment claim.  (Filing No. 45 at CM/ECF pp. 28-29.)  In order for Plaintiff to establish a hostile work environment claim, Plaintiff must show that: (1) he belongs to a protected group; (2) he "was subject to unwelcome harassment; (3)

---

[3]To the extent Plaintiff's claims are brought pursuant to 42 U.S.C. § 1981, the analysis is the same. *Saulsberry v. St. Mary's Univ. Of Minnesota,* 318 F.3d 862, 866 (8th Cir. 2003).  Therefore, Plaintiff's failure to set forth a prima facie case under Title VII means that he has also failed to carry his burden under § 1981.

a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper action." *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (quoting *Palesch v. Missouri Comm'n on Human Rights*, 223 F.3d 560, 566 (8th Cir. 2000)).

As with his other claims, Plaintiff has set forth no evidence supporting a hostile work environment claim. Indeed, the evidence submitted by Defendant shows, among other things, that the alleged incidents of harassment or ridicule were never brought to Tyson's attention. (Filing No. 45 at CM/ECF pp. 14-16.) Therefore, even if Plaintiff could prove the other four elements of a hostile work environment claim, there is no evidence showing that Tyson "knew or should have known" about the incidents complained of and failed to take action. As such, Plaintiff's hostile work environment claim also fails.

### E.     Plaintiff's State-Law Claims

In addition to his discrimination claims, Plaintiff also alleges state-law claims of false imprisonment, assault, battery, and malicious prosecution as a result of his arrest and removal from the Madison plant on his last day of work. (Filing No. 1 at CM/ECF pp. 5.) The undisputed evidence shows that Tyson had nothing to do with Plaintiff's arrest, detention, or prosecution. Plaintiff willingly remained at the Madison plant after being asked to leave. He was given numerous opportunities to leave voluntarily. When Plaintiff refused, the Madison County sheriff's office arrested him. Tyson did not arrest Plaintiff, did not request his arrest, and did not request Plaintiff's prosecution. Madison County, Nebraska employees took these actions without assistance from Tyson. These individuals did not take these actions on Tyson's behalf. (Filing No. 45 at CM/ECF pp. 19-21.) Plaintiff has submitted no evidence showing otherwise and summary judgment is therefore proper on Plaintiff's

20

state-law claims.

IT IS THEREFORE ORDERED that:

1.     Defendant's Motion for Summary Judgment (filing no. 43) is granted.

2.     A separate Judgment will be entered in accordance with this Memorandum and Order.

February 23, 2009.                    BY THE COURT:

                                      s/ Joseph F. Bataillon
                                      Chief United States District Judge

21